UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
KAREN SANTOSUOSSO,              :
                               :    HONORABLE JOSEPH E. IRENAS
        Plaintiff,             :
                               :    CIVIL ACTION NO. 04-2923 (JEI)
    v.                         :
                               :         OPINION
NOVACARE REHABILITATION,       :
SELECT MEDICAL CORPORATION,    :
and JOSEPH DERELLA,            :
                               :
        Defendants.            :
```

**APPEARANCES:**

COOPER LEVENSON APRIL NIEDELMAN WAGENHEIM & LEVENSON, A
      PROFESSIONAL ASSOCIATION
By:  Eileen O. Muskett
1125 Atlantic Ave. 3rd Floor
P.O. Box 1125
Atlantic City, NJ  08404-1125
      Counsel for Plaintiff


FISHER & PHILLIPS LLP
By:  Patricia S. Robinson
580 Howard Avenue
Somerset, NJ  08873
      Counsel for Defendants


**IRENAS**, Senior District Judge:

This case was removed by Defendants from the Superior Court
of New Jersey pursuant to 28 U.S.C. § 1441.[1]  Plaintiff claims
Defendants are liable under the Family and Medical Leave Act (the
"FMLA"), 29 U.S.C. §§ 2601 et seq., New Jersey Family Leave Act
(the "NJFLA"), New Jersey Law Against Discrimination (the

---

[1]  Subject matter jurisdiction is based on 28 U.S.C. §§ 1331
and 1367.

"NJLAD"), and New Jersey common law.  Before the Court are the
Motion for Summary Judgment and Motion to Strike Punitive
Damages[2] by Defendants.  For the reasons stated below, both
Motions will be granted in part and denied in part.

## I.

Plaintiff, Karen Santosuosso, was employed by Defendant
NovaCare Rehabilitation ("NovaCare") in 1996.  Plaintiff became
an employee of Defendant Select Medical Corporation ("Select") in
1999, when Select acquired NovaCare.  (Santosuosso Dep. at 45:9-
13).  Defendant Joseph Derella was Plaintiff's immediate
supervisor.  He serves as the Clinical Operations Director, and
reports to Ed Malloy, an area vice president.

In September of 2000, Plaintiff was promoted from a Center
Manager ("CM") to a Manager of Clinical Operations ("MCO") for
the Ventnor facility, as well as the facilities in Brigantine and
Atlantic City, New Jersey.  (Santosuosso Dep. at 45:14-20, 45:17,
46:19-21).

In or about June 2002, Plaintiff informed Derella that she
would take a maternity leave.  (Santosuosso Dep. at 79:7-13).
Plaintiff began her leave on October 11, 2002.  (*Id.* at 78:11-

---

[2]  Defendants did not file their request as a separate
motion; rather, Defendants' brief contained a section arguing
that requests for punitive damage should be stricken.  The Court
will construe this argument as a motion.

2

23).  After Plaintiff's 12-week leave under the FLMA and NJFLA expired in February 2003, she received additional leave under Select's Extended Illness Days ("EID") program, with Derella's permission.  (Santosuosso Dep. at 89:19-90:9).  Plaintiff's leave was extended to March 3, 2003.

Shortly before she returned to work, Plaintiff requested that she be allowed to work at the Ventnor facility Monday through Thursday, and to bring all administrative and marketing work home to perform on Friday.  (Santosuosso Dep. at 85:4-9).  She hoped to have a work week of 35 hours, but promised to keep the center "running full speed ahead."  She also promised that she would work 40 hours "in special circumstances."  (Df. Appx. at p. 241).  Prior to her leave, Plaintiff worked 40 to 60 hours per week as a MCO.  (Santosuosso Dep. at 87:18-24).  HR informed Derella that no MCO worked less than 40 hours per week, but a CM was permitted to work less than 40 hours per week.  (Derella Dep. at 79:14-81:4).  Thus Derella informed Plaintiff that the reduced schedule could be accommodated if she would return to Ventnor as the CM, with no reduction in her salary.  (*Id.* at 81:5-15).  Plaintiff agreed to this arrangement.

In March 2003, Plaintiff met with Derella and Frank McBride.  Mr. McBride became the MCO responsible for the Ventnor facility when Plaintiff returned to work as a CM.  The Ventnor facility experienced financial losses and did not meet patient visit

3

targets between February and August 2003.  Plaintiff claims that
Derella controlled the Ventnor facility during her leave, and
that the financial performance of the facility suffered.
Plaintiff also claims that the financial losses at the Ventnor
facility were partially the result of limited air conditioning in
July of 2003, which led to a very high number of cancellations
during the month.

In her annual Performance Review dated March 19, 2003,
Plaintiff received evaluations indicating that her job
performance consistently exceeded Defendants' requirements and
expectations in quality and outcome.  (Def. Ex. D-13).  The
report stated that "with her absence from October 2002 through
February of 2003 the center has tended in a negative direction."
(*Id.*).

On August 5, 2003, Robin Smith,[3] an employee at the Ventnor
facility who was seeking to transfer out of the facility, told
Derella that she was upset with the amount of responsibility that
Plaintiff was delegating to her.  (Smith Dep. at 12:19-13:6).
Ms. Smith also claimed that Plaintiff was not keeping to her
scheduled hours and sometimes would leave early.  (*Id.* at 12:3-
13).  In addition, Ms. Smith voiced suspicion that Plaintiff
might have committed forgery on some medical forms.  (*Id.* at

_____

[3]  In October 2004, Ms. Smith (formerly Ms. Ford) was
married.  The Court will refer to her as Ms. Smith in this
opinion.

4

12:3-8, 14:20-16:18).  However, Ms. Smith also testified that she did not complain about her observations.  She stated that the reason she requested a transfer was to be closer to her home and school.  (*Id.* at 43:9-15).

In late July to early August 2003, Plaintiff became pregnant again.  She told Ms. Smith as soon as she found out, and informed the entire Ventnor staff two or three weeks later.

Defendants claim that the complaints from Ms. Smith, the absences, and the poor financial performance for five months caused Derella to recommend to Mr. Malloy, on August 27, 2003, that Plaintiff be transferred to the Marmora facility and demoted to staff physical therapist, (Derella Dep. at 177:11-178:6), that her salary be reduced by 3%, (*Id.* at 77:8-16), and that Mr. McBride move from the Marmora facility to the Ventnor facility as the interim CM/MCO.  (*Id.* at 108:22-109:15).  Due to vacations and the Labor Day holiday, these plans were not implemented until September 4, 2003.  (*Id.*).  On September 4, Plaintiff was officially transferred and demoted.

Plaintiff sent an email to Derella on September 2, 2003, informing him of her second pregnancy.  (Def. Ex. D-17, Def. Appx. at p. 250).  Plaintiff again requested FMLA leave after the scheduled childbirth on March 17, 2004.  Plaintiff acknowledged that the September 2, 2003, email was the first time she directly informed Derella that she was pregnant.  (*Id.*).  After receiving

Plaintiff's email, Derella asked HR whether the staffing plan
could proceed and was instructed to proceed with the plan.  (Def.
Appx. at p. 303).

        On September 8, 2003, Mr. McBride became the CM for the
Ventnor facility.  He began an investigation of Plaintiff's
alleged forgery immediately.  Mr. McBride claims that he
discovered patient forms which he believed had been altered.
(McBride Dep. at 122:19-124:2).  When he asked Ms. Smith about
the forms, she informed him that it had been cut and pasted by
Plaintiff.  (*Id*. at 124:15-24).  Plaintiff claims that all of the
physical therapists and the front desk staff at the Ventnor
facility had access to the patient's files and the Medicare
forms.  Any of them could have altered the patient's form.
(Santosuosso Dep. at 240-248).  In addition, Ms. Smith had
numerous opportunities to report Plaintiff's alleged forgery to
Select's Ethics Hotline, but she never reported any such
incident.

        On September 12, 2003, Derella met with Plaintiff and
McBride.  At the meeting, Derella terminated Plaintiff for
violations of Select's policy regarding falsification of
documents.  (Santosuosso Dep. at 190:11-191:4).

        Prior to her first FMLA leave, Plaintiff was the MCO with
oversight responsibilities for three facilities and was earning
$66,830 as of March 2002.  Mr. McBride, who was the MCO for four

6

facilities, was paid $64,000 per year as of July 2002.  In March
2003, Plaintiff's salary was increased to $68,827.  Mr. McBride
received a raise in July 2003, increasing his salary to $70,000.
At this time, he was the MCO responsible for seven centers.
Plaintiff at no time was responsible for more than three centers.

## II.

"Under Rule 56(c), summary judgment is proper 'if the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to a judgment as a matter of law.'"
*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed.
R. Civ. P. 56(c)).

In deciding a motion for summary judgment, the Court must
construe the facts and inferences in a light most favorable to
the non-moving party.  *Pollock v. Am. Tel & Tel. Long Lines*, 794
F.2d 860, 864 (3d Cir. 1986).  The role of the Court is not "to
weigh the evidence and determine the truth of the matter, but to
determine whether there is a genuine issue for trial."  *Anderson
v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "[A] party
opposing a properly supported motion for summary judgment may not
rest upon the mere allegations or denials of his pleading, but
... must set forth specific facts showing that there is a genuine

issue for trial."  *Id.* at 248 (internal quotation and citation omitted; ellipsis in original).

"'With respect to an issue on which the non-moving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'– that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'"  *Conoshenti v. Public Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004).

### III.

### A.

Plaintiff first claims that Defendants violated the FMLA and the NJFLA.  The FMLA entitles an eligible employee to "a total of 12 workweeks of leave during any 12-month period ... [b]ecause of the birth of a son or daughter of the employee and in order to care for such son or daughter."  29 U.S.C. § 2612(a)(1)(A).  Similarly, the NJFLA entitles an employee to "a family leave of 12 weeks in any 24-month period upon advance notice to the employer."  N.J.S.A. § 34:11B-4.  After the employee returns from her leave, she must be restored to her previous position or another position "with equivalent employment benefits, pay, and other terms and conditions of employment."  29 U.S.C. § 2614(a)(1); *see also* N.J.S.A. § 34:11B-7.

For violations of her FMLA rights, a plaintiff can seek

recovery under either the entitlement theory or the retaliation theory. *Parker v. Hanhemann University Hosp.*, 234 F. Supp. 2d 478, 485 (D.N.J. 2002). The entitlement theory under the FMLA "is based on the prescriptive sections of the FMLA which create substantive rights for eligible employees." *Id.*; *see also Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir. 1998).

The retaliation theory "protects employees from suffering discrimination because they have exercised their rights under the FMLA." *Parker*, 234 F. Supp. 2d at 487-88; *see also Hodgens*, 144 F.3d at 159. This theory is based on the "proscriptive rights" of the FMLA which prevent an employer from discriminating against employees and prospective employees who have taken FMLA leave. 29 U.S.C. § 2615(a)(2); 29 C.F.R. § 825.220(c).

To succeed on an entitlement theory claim, Plaintiff only needs to establish that "she was entitled to benefits under the FMLA and that she was denied them." *Parker*, 234 F. Supp. 2d at 485. One of the FMLA benefits is an employee's right to be restored to her previous employment position. 29 U.S.C. § 2614(a)(1). However, the FMLA does not require "an employer to provide a reasonable accommodation to an employee to facilitate his return to the same or equivalent position at the conclusion of his medical leave." *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 384 (3d Cir. 2002); *see also* 29 C.F.R. § 825.214(b).

9

To establish a *prima facie* case under the retaliation theory, a plaintiff must show that: "(1) he took an FMLA leave, (2) he suffered an adverse employment decision, and (3) the adverse decision was causally related to his leave." *Conoshenti v. Public Service Elec. & Gas Co.*, 364 F.3d 135, 146 (3d Cir. 2004).[4]

Once Plaintiff establishes a *prima facie* case, the burden shifting framework articulated in *McDonnell Douglas Corp. v. Green* applies.  411 U.S. 792, 800-06 (1973); *Parker*, 234 F. Supp. 2d at 488.  The burden then shifts to Defendants to establish a legitimate, non-discriminatory reason for the employment actions.  *McDonnell Douglas*, 411 U.S. at 802.  Then, the burden shifts back to Plaintiff to offer sufficient evidence that the reason offered by Defendants was a pretext for retaliation.  *Id.*

Plaintiff claims that Defendants violated the FMLA and the NJFLA by failing to place her in an equivalent position upon her return from leave.  (Compl. ¶ 27).  In addition, Plaintiff claims

---

[4]  The elements of a claim under the NJFLA are similar to those under the FMLA. *Fishman v. La-Z-Boy Furniture Galleries of Paramus, Inc.*, No. Civ. 04-749, 2005 WL 2000147 at n.10 (D.N.J. August 17, 2005).  Plaintiff must show that: (1) she was employed by Defendants; (2) she was performing satisfactorily; (3) a qualifying leave event occurred; (4) she took or sought to take leave from her employment; and (5) she suffered an adverse employment action as a result.  *DePalma v. Building Inspection Underwriters*, 350 N.J. Super. 195, 213 (App. Div. 2002).  Once Plaintiff establishes a *prima facie* case, the burden shifting framework applies.

that her demotion from MCO to CM and her termination were retaliation for her first leave and anticipated second leave.

Defendants argue that the FMLA only entitles an employee to 12 weeks of leave.[5]  *See* 29 U.S.C. § 2612.  Therefore, since Plaintiff's leave was more than 12 weeks, she is not entitled to the protections of the FMLA.  Defendants cite primarily to cases from Fourth and Fifth Circuit for this contention.  *See Hunt v. Rapides Healthcare System, LLC*, 277 F.3d 757 (5th Cir. 2001); *Brown v. Trans World Airlines*, 127 F.3d 337, 342 (4th Cir. 1997).

The Court rejects this proposition because both cases cited by Defendants are distinguishable.  In *Hunt*, the Fifth Circuit ruled that genuine issues of material fact as to whether the plaintiff actually attempted to return to work on or before the date that her FMLA leave expired precluded summary judgment.  277 F.3d at 767-68.  The employee did not seek, and the employer did not permit, an extension for the leave.  Without an employer's permission for an extension of FMLA leave, an employee who fails to return to work on or before the date that FMLA leave expires would lose the right to reinstatement.  *Id.* at 763.

In *Brown*, the plaintiff conceded on appeal that she had taken leave in excess of that required to be given by the Act and that she never submitted medical documentation of her illness, as

---

[5]  The NJFLA also has a 12-week leave entitlement.  N.J.S.A. § 34:11B-4.

the Act permits employers to require.  127 F.3d 342.  Thus, the
Fourth Circuit affirmed the summary judgment against her.

Here, the record is undisputed that after Plaintiff's FMLA
leave expired, she took a longer leave pursuant to Defendants'
EID program and with Defendants' permission.  The record does not
contain evidence showing that Defendants informed Plaintiff that
the extension of her leave was a revocation of her FMLA rights.

In *Sherry v. Protection, Inc.*, the defendant granted the
plaintiff a five-week FMLA leave to care for his father.  981
F. Supp. 1133 (N.D. Ill. 1997).  His father died before the
expiration of his leave, and the plaintiff did not return to work
on the day after his father's death; the defendant was aware of
date of his father's death, but gave the employee no notice that
he was required to return to work immediately.  *Id.* at 1134.  The
court ruled that the failure to give notice, coupled with the
fact that the defendant had knowledge of the death of the
plaintiff's father, precluded the defendant from penalizing the
plaintiff for not immediately returning to work.   *Id.*

The Court finds the analysis in *Sherry* analogous and
persuasive.  Defendants had knowledge of Plaintiff's intention to
take a longer than 12 week leave and their employee benefit
program allowed her to do so.  Thus, in light of the
Congressional encouragement for employers to provide more
generous benefits than mandated by the law, *see* 29 U.S.C. § 2653,

Plaintiff should not lose her FMLA protection for taking a leave longer than 12 weeks when her employer gave her the permission to do so.[6]

However, the record clearly demonstrates that Plaintiff requested a reduction of working hours.  (Def. Appx. at p. 241). Defendants testified that the MCO position requires at least 40 work hours per week, (*see* Derella Dep. at 79:14-81:4), and Plaintiff testified that as a MCO, she worked between 40 and 60 hours per week.  (Santosuosso Dep. at 87:18-24).  The MCO position was offered to her when she returned, on the condition that she keeps the same hours as she kept prior to taking leave. "[A]n employer [is not required] to provide a reasonable accommodation to an employee to facilitate his return." *Rinehimer*, 292 F.3d at 384.  Plaintiff has offered no evidence that this reason was pretextual.  Thus, Plaintiff is not entitled to be restored to her previous position.

For her second, anticipated leave, Defendants argue that they did not know that Plaintiff was pregnant until the decision to terminate her was already made.  Thus, an inference of retaliation is impossible.  In addition, Defendants argue that

---

[6]  Alternatively, courts have applied the doctrine of equitable estoppel in similar cases, when the employer's conduct precludes it from terminating an employee's employment, a right to which the employer would have otherwise been entitled.  *See, e.g., Barone v. Leukemia Soc. of America*, 42 F. Supp. 2d 452, 463-64 (D.N.J. 1998).

since the NJFLA entitles an employee to a 12-week leave every 24 months, Plaintiff would not be entitled to benefit under the NJFLA when she intends to take her second leave.[7]

The record contains Plaintiff's testimony that she announced her pregnancy to Ms. Smith in late July to early August 2003, and to the staff a few weeks later.  It is undisputed that in late August, Defendants demoted and transferred her out of the Ventnor center, citing financial performance and staff morale as reasons. As soon as Mr. McBride took over the management of the Ventnor facility, he immediately lunched in investigation of Plaintiff's alleged forgery.  Plaintiff produced evidence showing that she was not responsible for the poor financial condition of the center,[8] and that the staff's transfer requests were for reasons unrelated to her.  Nevertheless, she was terminated four days after her transfer and demotion, or a little more than a month after the initial announcement of her pregnancy to Ms. Smith. This temporal proximity creates an inference, for the purpose of deciding a motion for summary judgment, that her demotion, transfer, and termination could be retaliatory in nature.

The Court will deny summary judgment with respect to the

---

[7]  Defendants acknowledge that Plaintiff would be eligible for another leave under the FMLA on October 14, 2003.  (Def. Br. at p. 10).

[8]  Indeed, her annual review suggested that the Ventnor facility began to suffer financially only when Plaintiff began her FMLA leave, when Derella was responsible for the center.

FMLA retaliation claim, and will grant summary judgment with respect to the NJFLA claim and the restoration claim.

## B.

Plaintiff also claims that the adverse employment actions she experienced constitute gender discrimination in violation of the NJLAD.  To establish such a claim, Plaintiff must prove that "the prohibited consideration ... played a role in the decision making process and that it had a determinative influence on the outcome of that process." *Greenberg v. Camden County Vocational and Technical Schools*, 310 N.J. Super. 189, 198 (App. Div. 1998); *see also Miller v. CIGNA Corp.*, 47 F.3d 586, 597 (3d Cir. 1995). New Jersey courts have adopted the burden shifting framework articulated in *McDonnell Douglas*.  *See Erickson v. Marsh & McLennan Co., Inc.*, 117 N.J. 539, 551-52 (1990); III. A., *supra*. Under New Jersey law, "discrimination against women by reason of pregnancy violates the [NJLAD]."  *Leahey v. Singer Sewing Co.*, 302 N.J. Super. 68, 81 (Law Div. 1996); *see also Rendine v. Pantzer*, 276 N.J. Super. 398 (App. Div. 1994).

To establish a *prima facie* case of gender discrimination, Plaintiff must show that: (1) Plaintiff belongs to a protected class; (2) Plaintiff was performing her job at a level that met her employer's legitimate expectations; (3) Plaintiff suffered an adverse employment action; and (4) the employer sought someone

15

who is not a member of the protected class to perform the same work after Plaintiff's termination.  *Zive v. Stanley Roberts, Inc.*, 182 N.J. 436, 450 (2005).

Defendants argue that legitimate, non-discriminatory reasons existed for each adverse employment action.  Defendants assert that Plaintiff's demotion from MCO to CM was done in order to accommodate her reduced working schedule.  The reasons for demoting and transferring Plaintiff to another center were the poor financial performance of the Ventnor facility, the missing work hours, and the unhappiness of the Ventnor facility staff. The reason for Plaintiff's termination was forgery.

The record does not contain a factual dispute with respect to Plaintiff's demotion from MCO to CM.  *See* III. A., *supra*. Thus, the Court will grant summary judgment on this claim.

With respect to her demotion, transfer, and termination, Plaintiff offered evidence that shows the following: (1) the decrease of the Ventnor facility's profitability was due to Derella's poor management and the lack of air conditioning during the summer of 2003; (2) Ms. Smith's reason for wanting to leave the Ventnor facility was to be closer to her home and school; (3) Plaintiff was soliciting business during those alleged missed hours; and (4) another staff member at the Ventnor facility could have committed the alleged forgery.  This evidence directly undermines Defendants' proffered non-discriminatory reasons.  In

16

addition, the temporal proximity between Plaintiff's announcement of her pregnancy and her transfer, demotion, and termination, creates an inference of discrimination. *See* III. A., *supra*. The Court will deny summary judgment with respect to these claims.

If Plaintiff prevails on the underlying NJLAD claims, another employee can be held individually liable as an aider and abettor. *Tarr v. Ciasulli*, 181 N.J. 70, 84 (2004). In addition, an employer may be held vicarious liable for a supervisor's violation of the NJLAD. *See Heitzman v. Monmouth County*, 321 N.J. Super. 133 (App. Div. 1999). Therefore, the Court will deny summary judgment with respect to Derella's personal liability and Defendants Select and NovaCare's vicarious liability.

### C.

Plaintiff claims that Defendants violated the NJLAD by compensating Mr. McBride at a higher rate when he replaced her as the MCO. (Compl. ¶¶ 58-59). The New Jersey Supreme Court has created a two-part analysis for claims of disparate pay under the NJLAD. First, the claim must be analyzed under the standards and methodology of the Equal Pay Act, 29 U.S.C. § 206(d) (the "EPA"). *Grigoletti v. Ortho Pharmaceutical Corp.*, 118 N.J. 89, 109-10 (1990). If a plaintiff fails to establish a *prima facie* case under the EPA standards, she has a "second chance" if she can

show that the work is "similar" under Title VII standards.[9]  *Id.* at 101.

Under the Title VII standard, once Plaintiff establishes a *prima facie* case, the burden shifting framework applies, and Defendants are required to articulate a legitimate non-discriminatory reason for the difference in pay.  But, "the ultimate burden of persuasion shall remain on the plaintiff." *Grigoletti*, 118 N.J. at 110.

Assuming that Plaintiff can establish a *prima facie* case under Title VII, Defendants argue that the difference in salaries between Plaintiff and Mr. McBride resulted from the different responsibilities, a legitimate non-discriminatory reason. Plaintiff does not dispute that prior to her first leave, Mr. McBride actually received a lower salary than she did.  Not until Mr. McBride received his raise in July 2003 did his salary exceed hers by $1,173.  However, at that time, Plaintiff was a CM responsible for only the Ventnor facility, whereas Mr. McBride had supervising responsibility for seven different facilities. Plaintiff also failed to offer any evidence to show that this reason was a pretext for Defendants' discriminatory intentions. Thus, the Court will grant summary judgment with respect to her disparate pay claim.

---

[9]  Because the EPA standard is more stringent than the Title VII standard, a plaintiff who fails to meet the Title VII standard will be unable to meet the EPA standard.

**D.**

Plaintiff claims that Defendants committed defamation by accusing her of falsified signatures.  Under New Jersey law, defamation is defined as: "(1) a defamatory statement of fact; (2) concerning the plaintiff; (3) which was false; (4) which was communicated to a person or persons other than the plaintiff; (5) with actual knowledge that the statement was false or with reckless disregard of the statement's truth or falsity or with negligence in failing to ascertain the truth or falsity; and (6) which caused damage."  *Monroe v. Host Marriot Services Corp.*, 999 F. Supp. 599, 603 (D.N.J. 1998)(Irenas, J.)(citing *Feggans v. Billington*, 291 N.J. Super. 382, 391 (1996)).

New Jersey courts have recognized that in certain situations, defendants are entitled to qualified privilege. Under New Jersey law, "a publisher of a defamatory statement is protected from liability if the statement is made for a common interest shared between the publisher and the recipient." *Monroe*, 999 F. Supp. at 604-05.  Whether a defendant is protected by qualified privilege is a question of law.  *Bainhauer v. Manoukian*, 215 N.J. Super. 9, 40 (App. Div. 1987).

Plaintiff claims that Defendants' accusation of her falsifying documents is a pretext for firing her, in violation of her FMLA and NJLAD rights.  Defendants claim that the accusation of falsification is true, and that it is protected by qualified

19

privilege.  The record is disputed on this issue, and the Court will reserve its judgment at this stage of the litigation and will deny summary judgment on this claim.

**E.**

Defendants seek to strike Plaintiff's requests for punitive damages in all Counts.  Punitive damages are unavailable under the FMLA.  *Zawadowicz v. CVS. Corp.*, 99 F. Supp. 2d 518, (D.N.J. 2000); *see also  Lloyd v. Wyoming Valley Health Care System, Inc.*, 994 F. Supp. 288 (M.D. Pa. 1998); *Settle v. S.W. Rodgers, Co., Inc.*, 998 F. Supp. 657, 666 (E.D.Va.1998).

Plaintiff's NJLAD claims are subject to the Punitive Damages Act.  N.J.S.A. § 2A:15-5.9 et seq.  In order to receive punitive damages, Plaintiff must meet a higher burden of proof.  *See Dong v. Alape*, 361 N.J. Super. 106, 116 (App. Div. 2003).  This burden requires Plaintiff to establish, by clear and convincing evidence, that the alleged discrimination was committed for the purpose of harming her, or with the knowledge that it would harm her and with reckless indifference to that harm.  N.J.S.A. § 2A:15-5.12(a).

Disputed issues of fact preclude the Court from ruling at this time that, as a matter of law, Plaintiff is not entitled to recover punitive damages.  Accordingly, the motion to strike punitive damages will be denied with respect to Plaintiff's NJLAD claims.  The motion to strike punitive damages will be granted with respect to Plaintiff's FMLA claim.

Date: November 22, 2006

s/Joseph E. Irenas
**JOSEPH E. IRENAS, S.U.S.D.J.**

21